UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| JAMES D. WHITE and BRENDA WHITE, | ) ) ) | CIV. 06-4272-KES ORDER DENYING DEFENDANTS' MOTION TO |
| Plaintiffs, | ) ) ) | EXCLUDE THE TESTIMONY OF PLAINTIFFS' EXPERT OR IN |
| vs. | ) ) | THE ALTERNATIVE TO STRIKE THE SUPPLEMENTAL REPORT |
| COOPER INDUSTRIES, INC., a/k/a Cooper Industries, Ltd. and COOPER TOOLS, INC., | ) ) ) ) | OF PLAINTIFFS' EXPERT AND GRANTING IN PART AND DENYING IN PART |
| Defendants. | ) ) | DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

Pending before the court is the motion of defendants, Cooper Industries, Inc., a/k/a Cooper Industries, Ltd., and Cooper Tools, Inc., to exclude the testimony of plaintiffs' expert, Lester B. Engel, P.E., and in the alternative, to strike Engel's supplemental report dated June 10, 2008.  Also pending is defendants' motion for summary judgment.  Defendants request oral argument on both motions.  Plaintiffs, James and Brenda White, oppose defendants' motions.  Defendants' motion to exclude and alternative motion to strike are denied, and their motion for summary judgment is granted in part and denied in part.

**FACTUAL BACKGROUND**

This case arises out of an accident that occurred while Mr. White was working as a forklift mechanic at Herc-U-Lift.  On February 19, 2004,

Mr. White set out to repair a forklift by suspending its fork carriage assembly with a chain manufactured by defendants.  While Mr. White was working underneath the suspended carriage assembly, two links of the chain broke.  The carriage assembly fell onto Mr. White, causing injury to his abdomen, pelvis, and legs.  Plaintiffs sued defendants, alleging strict liability in tort and loss of consortium.[1]  The facts taken in the light most favorable to plaintiffs, the nonmoving parties, are as follows.

On the morning of February 19, 2004, Mr. White's supervisor, Chuck Van Hofwegen, asked him to repair a forklift that had an oil leak in its lift cylinder.  Defendants' Statement of Undisputed Material Facts (DSUMF), Docket 54 at ¶ 22.  In order to access the lift cylinder, Mr. White had to move the carriage assembly out of the way, which he could do either by removing the carriage assembly from the forklift or by raising it to an upright position and securing it with two steel chains, an overhead crane, a combination of chains and solid wood blocks, or a single chain.  DSUMF at ¶¶ 23-30.  Mr. White chose to raise the carriage assembly and secure it with a single chain because

---

[1] Plaintiffs' original complaint alleged strict liability in tort, negligence, breach of warranty, and loss of consortium.  After the parties fully briefed defendants' motion for summary judgment, plaintiffs filed an amended complaint which did not include the negligence and breach of warranty claims.  Pursuant to the agreement of the parties (see Docket 79), the court will evaluate defendants' motion for summary judgment based on the previously-filed briefs, addressing only plaintiffs' strict liability and loss of consortium claims.

this was the common practice at Herc-U-Lift.  Video Deposition of James D. White (White Deposition), Docket 58-3 at 76-77.

Mr. White selected a 3/8" x 16' Grade 43 welded eye grab hook assembly manufactured by defendants (the failed chain)[2] from a selection of chains in the Herc-U-Lift shop, visually inspected it, and wrapped it around the left side of the forklift's mast so that one of the grab hooks was attached to a link and the other grab hook was left to dangle.  DSUMF at ¶¶ 1-3, 36-38.  Then he turned off the forklift's engine and released the pressure from the forklift's hydraulic system, putting the full weight of the carriage assembly on the chain.  White Deposition at 81-82.

After securing the carriage assembly with the failed chain, Mr. White began working on the cylinder.  He removed the primary feed hose from the fitting, but had problems removing the fitting itself.  He unsuccessfully tried to spin the fitting out and then to raise the cylinder with a pry bar to create enough clearance to pull the fitting out.  After Van Hofwegen advised Mr. White that a roll pin might be securing the fitting, Mr. White located the roll pin and observed that it looked rusted in.  So he hammered on the mount bracket around the roll pin to break the rust loose, and was able to lift the cylinder about one-eighth of an inch.  He attempted to pry out the cylinder, but the pry

---

[2] The failed chain consisted of approximately 160 links, connected at each end to a hook.

3

bar kept slipping.  Eventually, Mr. White got out from under the carriage assembly, retrieved a different pry bar and some cardboard to place on the floor below the carriage assembly, went back under the carriage assembly, attempted to use the new pry bar, and started to get up to find a nylon strap with which to lift out the cylinder.  At that point the failed chain broke and the carriage assembly fell onto Mr. White.  White Deposition at 82-90.

Both parties have retained expert witnesses to explain how the failed chain broke.  Plaintiffs retained Engel, a metallurgical engineer, to serve as a testifying expert and timely disclosed his expert report on August 30, 2007 (2007 Report).  See Engel 2007 Report, Docket 59-4.  Because the reliability of Engel's testimony is at issue, the court will discuss his opinions in detail.  The thrust of Engel's testimony is that the chain failure resulted from defects in one or more of the failed chain's links.  Engel's 2007 Report indicates that he conducted a visual examination, Rockwell B hardness testing, and a metallographic examination of the failed chain.  Engel also conducted load testing on an exemplar chain.  Engel found that the failed chain failed at two links positioned one link apart.  Both links exhibited ductile shear fractures.  Engel found no evidence of fatigue fractures or prior cracking in the failed links.  One of the failed links appeared to have experienced a bending load on its side, leading Engel to conclude that the hook had been attached to that link.  Only a few links had been elongated slightly over the life of the failed

4

chain, indicating that the failed chain had not been exposed to severe overloads during its lifetime.  Engel also found that the hardness of the failed and unfailed links was typical of links of that type.  Load testing of the exemplar chain showed that a typical Grade 43 chain exhibited breaking strengths that exceeded the specified minimum even when tied in a knot around a sharp cornered object.

Engel determined that the failed chain was supporting a load of only 45 percent of its maximum working load and 15 percent of its minimum breaking force requirement at the time of the accident.  Even with the observed wear, the failed chain would not be expected to break with such a light load.  Based on the ductile shear fracture failure mode of the failed links and the lack of evidence of a fatigue fracture or other unusual condition in the failed chain, Engel concluded that the root cause of the failure was a defective and unreasonably dangerous chain.

Defendants deposed Engel on January 17, 2008.  Engel testified that he believed the chain failure was caused by a material defect in the material of the failed chain, but was unable to define that defect.  Deposition of Lester B. Engel, P.E., Docket 59-14 at 205-06.  He agreed that he had conducted all of the tests generally accepted by metallurgists as tests designed to find defects in materials, and that these tests did not reveal any defects with the materials. Engel Deposition at 206.

5

Counsel for defendants asked Engel whether there was a second hypothetical explanation of how the chain failed, that is, that the failed chain was somehow severely overloaded.  See Engel Deposition at 191.  Engel agreed that a chain may fail because it experiences a greater load than it was designed and manufactured to withstand as well as because some links are weaker than the others.  Engel Deposition at 187.  Engel admitted that the testing of the links of the failed chain did not reveal any reasons why the links should be weaker, making the overloading alternative more reasonable.  Engel Deposition at 187.  Engel stated, however, "[b]ut then you have – the other part of that is that there's something else about those links that we've not figured out that makes them problematic."  Engel Deposition at 187-88.  Engel later testified that he did not consider the overloading hypothesis a true alternative in this case because there were no facts suggesting an excessive load.  Engel Deposition at 191.  Because the carriage assembly was static and weighed only 2,430 pounds, Engel concluded that the failed chain was not overloaded.  Engel Deposition, Docket 72-2 at 199-200.  He agreed that he was unable to conceptualize a way in which the failed chain carried a load of greater than 2,430 pounds at the time of the accident.  Engel Deposition at 193.

Engel also testified that it remained his opinion that the failed chain failed at two links positioned one link apart.  He admitted that it was "not absolutely clear just which link went first," and that he did not have an opinion

to a reasonable degree of engineering certainty as to which link failed first. Engel also did not have an opinion to a reasonable degree of engineering certainty as to whether the failed link that opened up at 42 degrees was hanging free and not under any load before the accident occurred.  Engel Deposition at 183.

Defendants retained as a testifying expert Salvatore C. Malguarnera, Ph.D., P.E., a mechanical engineering technical consultant.  Malguarnera wrote a report dated April 21, 2008, in which he addressed Engel's expert opinions and described testing that showed how the failed chain may have become overloaded.  Docket 59-12.  Malguarnera concluded that a load of 2,400 pounds can break a new 3/8-inch Grade 43 chain if it is applied in a rapid or dynamic way.  Plaintiffs deposed Malguarnera on May 12, 2008.  See Deposition of Salvatore C. Malguarnera, Ph.D., P.E., Docket 58-8. Malguarnera testified that if the mast of a forklift fell three to three and a half feet, it could break a new Grade 43 chain.  Malguarnera Deposition at 18.  He explained that his "dynamic loading" theory explained how a 2,400 pound load could have broken a 3/8-inch Grade 43 chain that did not have any defects. Malguarnera Deposition, Docket 65-2, Ex. C at 85-86.

Engel wrote a supplemental report dated and served on defendants on June 10, 2008 (2008 Report), one week after the close of discovery.  See Engel 2008 Report, Docket 59-11.  A significant portion of Engel's 2008 Report

7

discussed Malguarnera's testing and results.  Engel examined the exemplar chains from Malguarnera's testing and described the links in detail in his report.  Engel also provided several reasons why Malguarnera's dynamic loading theory did not explain how the failed chain broke.  Based on the orientation of the links in the incident chain, Engel concluded that the failed link attached to the hook was the first link to fail.  The other failed link was part of the free end of the chain at the time of the accident, and Engel opined that it failed after becoming entangled in the lift truck components as they fell. Malguarnera's chain testing, however, never resulted in a link failure at a grab hook attachment.  Based on Malguarnera's testing, Engel concluded that if the failed chain had failed as a result of dynamic loading, it would have failed where the chain wrapped around the lift truck structure, not at the grab hook attachment.  Further, there was no evidence that the carriage assembly was positioned in a way that could have created a dynamic load on the chain. Finally, the links of the failed chain did not show significant elongation, but measurement of the chains from Malguarnera's testing showed that chain links elongate when dynamically loaded.

Engel concluded his 2008 Report with further discussion of the failed chain.  He explained that the first link to fail, the one attached to the hook, became significantly deformed before finally failing.  The deformation of a link happens over time, and should only occur when the load exceeds the working

load limit.  A defective chain link with a localized discontinuity, low yield strength, or low elongation, however, can become deformed at much lighter loads.  Engel stated that he could not determine whether there was a discontinuity in the failed link.  But, "[a]lthough no specific defective properties could be identified, all of the evaluation results and accident history support that the chain failure was the result of a defective chain link."  Engel 2008 Report at 5.

Defendants' experts, on the other hand, opine that the failed chain was not defective.  Brian D. Todd, metallurgical engineer and defendants' manager for Quality and Metallurgical Services, performed a non-destructive inspection of the failed chain and concluded that the failure was caused by an overload condition.  He found that both broken links showed ductile shear type fracture surfaces, which happens when steel is overloaded.  Todd also examined a metallurgical cross section of the failed chain, and concluded that the microstructure of the steel was typical and that there were no defects in material or manufacture.  Finally, Todd found that the chain exhibited damage, wear, and tear consistent with being in service for several years.  He found that the extent of the wear on some of the links exceeded the out-of-service condition for thickness as provided in the National Association of Chain Manufacturers "Welded Steel Chain Specifications" and in defendants'

9

literature, so that the failed chain should have been removed from service before Mr. White used it.   Todd Report, Docket 34-19 at 4-5.

Defendants also retained Dave Kramer, P.E., who examined the failed chain and concluded that there were no flaws or defects in the chain.  He also found that "[t]he failure of two links by ductile shear along with the bending and gouging of adjacent links cannot be explained by static loading.  This failure can be explained by a sudden impact load such as the carriage dropping and impacting a slack chain."  Like Todd, Kramer opined that the pre-accident abrasive wear and gouging of the failed chain was severe enough that it should have been taken out of service.  Kramer Report, Docket 58-14 at 3.

In addition to their metallurgical engineering experts, defendants retained two mechanical engineering experts to investigate possible causes of the accident.  As previously discussed, Malguarnera proposed the dynamic loading theory.  In his opinion, "[t]he only conclusion that can be reached based on the scientific evidence is that the chain . . . failed because of the rapid descent of the unrestrained section of the mast of the forklift that Mr. White was working on and not because of some 'mysterious' defect."  Malguarnera Report, Docket 58-6 at 3.  Malguarnera also concluded that the failed chain was not defective in design or manufacture, the failed chain was in unserviceable and unsafe condition and should not have been in use at the time of the accident, and that Mr. White did not secure the carriage assembly

10

in accordance with the directions contained in the forklift service manual.
Malguarnera Report, Docket 58-6 at 3-4.  Likewise, James L. Suhr, P.E.,
concluded that "[t]he nature of the failure indicates unidentified loading in
addition to the tensile load imposed by the mast."  Suhr Report, Docket 58-4 at
4.  Suhr did not offer an opinion on the source of the "unidentified loading."

## DISCUSSION

### I.   Exclusion of Engel's Expert Testimony

Defendants move to exclude Engel's testimony as unreliable under
Daubert and Federal Rule of Evidence 702.  In the alternative, defendants
move to strike Engel's 2008 Report as untimely under Federal Rule of Civil
Procedure 37(c).

### A.   Motion to Exclude under Federal Rule of Evidence 702 and Daubert

The admissibility of expert testimony is governed by Fed. R. Evid. 702.
Under this rule, the trial judge acts as a "gatekeeper" screening evidence for
relevance and reliability.  Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579,
589, 113 S. Ct. 2786, 2795, 125 L. Ed. 2d 469 (1993).  Pursuant to Fed. R.
Evid. 702:

> If scientific, technical, or other specialized knowledge will assist the
> trier of fact to understand the evidence or to determine a fact in
> issue, a witness qualified as an expert by knowledge, skill,
> experience, training, or education, may testify thereto in the form
> of an opinion or otherwise, if (1) the testimony is based upon
> sufficient facts or data, (2) the testimony is the product of reliable

principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

"Rule 702 reflects an attempt to liberalize the rules governing the admission of expert testimony.  The rule clearly is one of admissibility rather than exclusion."  Lauzon v. Senco Prods., Inc., 270 F.3d 681, 686 (8th Cir. 2001) (internal quotations and citations omitted).  "The exclusion of an expert's opinion is proper only if it is so fundamentally unsupported that it can offer no assistance to the jury."  Wood v. Minn. Mining & Mfg. Co., 112 F.3d 306, 309 (8th Cir. 1997) (internal quotations and citation omitted).

District courts have discretion in determining whether to admit expert witness testimony under Fed. R. Evid. 702.  See In re Air Crash at Little Rock Arkansas, on June 1, 1999, 291 F.3d 503, 509 (8th Cir. 2002).  Nonetheless, the proponent of expert testimony must prove its admissibility by a preponderance of the evidence.  Daubert, 509 U.S. at 592 n.10, 113 S. Ct. at 2796.

The Eighth Circuit has determined that a district court should apply a three-part test when screening testimony under Fed. R. Evid. 702.

> First, evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact.  This is the basic rule of relevancy.  Second, the proposed witness must be qualified to assist the finder of fact. Third, the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires.

Lauzon, 270 F.3d at 686 (internal citations and quotations omitted).  Here, there is no real dispute over the relevance and qualification prongs of the three-part test; Engel's opinion on what caused the failed chain to break is useful to the finder of fact, and Engel is a registered Professional Engineer with thirty-eight years of experience in metallurgical engineering.

Defendants argue, however, that Engel's opinion is unreliable.  With respect to the reliability prong, "it is the expert witnesses' methodology, rather than their conclusions, that is the primary concern of Rule 702."  Bonner v. ISP Tech., Inc., 259 F.3d 924, 929 (8th Cir. 2001).  Daubert and its progeny identify several nonexclusive factors a court can consider in evaluating a proposed expert's methodology: (1) whether the expert's theory or technique has been tested; (2) whether the theory or technique has been subjected to peer review and publication, (3) the technique's known or potential error rate; (4) whether the theory has been generally accepted; (5) whether the expertise was developed for litigation or naturally flowed from the expert's research; (6) whether the proposed expert ruled out alternative explanations; and (7) whether the proposed expert sufficiently connected the proposed testimony with the facts of the case.  Lauzon, 270 F.3d at 687. "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual

13

basis for the opinion in cross-examination." <u>Bonner</u>, 259 F.3d at 929 (internal quotations omitted).

Here, several factors weigh toward admitting Engel's testimony.  With respect to the testing factor, Engel's report indicates that he performed a number of standard tests on the failed chain—visual examination, Rockwell B hardness testing, and metallographic examination—as well as load testing on an exemplar chain.  The tests on the failed chain did not reveal any defects, but Engel concluded that the chain contained unidentified defects based on his finding that a non-defective chain should be able to withstand a load of the same weight as the carriage assembly.  Although defendants are correct that Engel cannot point to any tests positively identifying a defect in the failed chain, they have not shown that the technique Engel used to conclude that the chain was defective based on load testing of a non-defective chain was unreliable.

Defendants cite <u>Pro Service Automotive, L.L.C. v. Lenan Corp.</u>, 469 F.3d 1210 (8th Cir. 2006) for the proposition that the lack of test results supporting Engel's conclusion means that there is too great an analytical gap between the data and his opinion.  <u>Pro Service</u> is distinguishable.  There, the proposed expert offered a causation opinion without performing any testing at all.  469 F.3d at 1215-16.  Instead, he "offered only vague theorizing based on general principles."  <u>Id.</u> at 1216.  Unlike in <u>Pro Service</u>, where the opinion evidence was

14

connected to the existing data "only by the ipse dixit of the expert," here Engel performed tests on the failed chain and on an exemplar chain before concluding that a defect, albeit one that could not be identified by standard tests, caused the chain to fail. Defendants' argument that Engel's opinion is unreliable because he drew the wrong conclusion from scientifically accepted testing goes to the weight and credibility of his testimony, not its reliability.

The alternative explanations factor also weighs in favor of allowing Engel to testify at trial. Defendants argue that Engel should have adopted an alternative hypothesis after his testing of the failed chain did not reveal any identifiable defects. But Engel's deposition testimony and 2008 Report show that he did consider and discount defendants' proffered hypothesis that the chain failed due to dynamic loading. Engel relied on information from the scene of the accident to conclude that Malguarnera's dynamic loading theory was factually improbable. The forklift could not have been positioned in a way that would have resulted in a dynamic load on the chain. Moreover, Engel reasoned, the damage to the exemplar chains used in Malguarnera's testing did not line up with the damage sustained by the failed chain. The fact that Engel considered and rejected alternative explanations for the chain failure makes his opinion sufficiently reliable to be helpful to the trier of fact. Finally, Engel clearly connected his theory of how the chain failed to the facts of the present case, weighing toward admissibility of his opinion.

15

On the other hand, several factors weigh slightly toward excluding Engel's opinion. Plaintiffs have not shown that Engel's methodology has been subjected to peer review or publication, identified an error rate for this methodology, or shown that his technique is generally accepted. Further, although Engel developed general expertise in the area of metallurgical engineering as a result of his work in this field, his theory of how the chain failed in this case was developed for litigation, slightly undermining the reliability of his opinion. Overall, however, the <u>Daubert</u> factors weigh in favor of admission of Engel's opinion. Plaintiffs have shown that Engel's methodology in determining how and why the failed chain broke is sufficiently reliable to make his opinion helpful to the trier of fact. Defendants' arguments against Engel's conclusions can be brought out on cross-examination. <u>See Kudabeck v. Kroger Co.</u>, 338 F.3d 856, 862 (8th Cir. 2003) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). Accordingly, defendants' motion to exclude Engel's testimony under <u>Daubert</u> and Fed. R. Evid. 702 is denied.

### B.   Motion to Strike Engel's 2008 Report

As an alternative to their motion to exclude Engel's testimony under <u>Daubert</u> and Fed. R. Evid. 702, defendants move to strike Engel's 2008 Report as untimely under Fed. R. Civ. P. 26(a)(2) and 37(c). Plaintiffs argue that the

16

2008 Report was not untimely because it was offered solely to contradict or rebut defendants' expert testimony and because it qualified as a Fed. R. Civ. P. 26(e) supplementation. Further, plaintiffs argue, even if the report were untimely, the violation was substantially justified.

Fed R. Civ. P. 26(a)(2) governs the mandatory disclosure of expert testimony. Under this rule, each party must disclose the identity of any expert witness it may use at trial, along with a written report prepared and signed by the witness, by the date ordered by the court or, in the absence of a court order, 90 days before trial. Fed. R. Civ. P. 26(a)(2). If the evidence is offered solely to contradict or rebut expert testimony offered by another party, however, disclosure may be made up to 30 days after the other party's disclosure. Fed. R. Civ. P. 26(a)(2)(C)(ii). Each party also has an obligation to supplement information included in an expert's report or given during an expert's deposition "if the party learns that in some material respect the disclosure or response is incomplete or incorrect." Fed. R. Civ. P. 26(e). Absent a court order directing otherwise, supplemental disclosures must be made at least 30 days before trial. Fed. R. Civ. P. 26(a)(3)(B), 26(e).

Here, the court ordered plaintiffs to disclose their retained experts and their reports by September 4, 2007, and defendants to make their initial expert disclosures by March 28, 2008. Dockets 10 & 26. Based on a joint motion of the parties, the court ordered defendants to supplement their expert

disclosures by May 1, 2008.[3]  Docket 39.  Finally, the court ordered both parties to make Fed. R. Civ. P. 26(e) supplementations at least 20 days prior to trial.  Docket 10.  The court did not modify the 30-day deadline for disclosure of rebuttal expert testimony.  Plaintiffs served Engel's 2008 Report on June 10, 2008, approximately 9 months after their expert disclosures were due and 20 days after expert testimony offered solely to contradict or rebut Malguarnera's testimony was due.[4]  Therefore, Engel's 2008 Report is untimely unless it qualifies as a Fed. R. Civ. P. 26(e) supplementation.

     Fed. R. Civ. P. 26(e) obligates parties to supplement previously disclosed reports "if the party learns that in some material respect the information disclosed is incomplete or incorrect."  The purpose of a supplemental report is to "inform the opposing party of any changes or alterations," Tenbarge v. Ames Taping Tool Sys., Inc., 190 F.3d 862, 865 (8th Cir. 1999), not "to provide an extension of the deadline by which a party must deliver the lion's share of its expert information," Sierra Club, Lone Star Chapter v. Cedar Point Oil Co., 73 F.3d 546, 571 (5th Cir. 1996).

---

[3] The May 1, 2008, deadline was adopted to allow defendants to identify additional expert witnesses and serve their reports, and was not intended to replace the deadline for supplementations required under Fed. R. Civ. P. 26(e). See Joint Motion to Enlarge Certain Deadlines, Docket 37.

[4] Defendants served Malguarnera's report on April 21, 2008, so plaintiffs had until May 21, 2008, to disclose rebuttal testimony.  See Docket 59-12.

The court finds that Engel's 2008 Report qualifies as a supplemental report.  The bulk of this report responds to Malguarnera's theory and conclusions, which were disclosed after Engel wrote the 2007 Report.  The remainder of the report does contain new information about which link of the failed chain broke first and the process by which this link deformed, but the focus of the 2008 Report remains on what caused the failed chain to break. Engel's ultimate opinion, that a defect in one or more links caused the failure, was the focus of both Engel's 2007 Report and Engel's 2008 Report.

Defendants contend that Engel's 2008 Report ought to be stricken because his finding that the link attached to the hook failed first contradicts his deposition testimony.  The fact that Engel articulated a finding that he did not articulate in his deposition shows that his 2008 Report is necessary to inform defendants of changes in Engel's testimony.  Defendants may bring out any inconsistencies between Engel's testimony and his report at trial, but these inconsistencies do not render his 2008 Report untimely or inadmissible.  As a supplemental report disclosed before a trial date has been set, Engel's 2008 Report is not untimely.

Even if Engel's 2008 Report were untimely, the court finds that exclusion of the opinions contained within it would not be justified under Fed. R. Civ. P. 37(c)(1).  Untimely disclosure of an expert opinion triggers Rule 37(c)(1) sanctions, including the exclusion at trial of testimony on undisclosed

opinions.  See Fed. R. Civ. P. 37(c)(1).  These sanctions do not apply, however, if "the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  The trial court has great discretion in determining whether to strike expert testimony that is disclosed in contravention of the court's scheduling orders.  See Sylla-Sawdon v. Uniroyal Goodrich Tire Co., 47 F.3d 277, 285 (8th Cir. 1995).

The court finds that the timing of the disclosure of Engel's 2008 Report is substantially justified.  As noted, most of this report is devoted to responding to the testimony of defendants' expert.  Plaintiffs disclosed Engel's 2008 Report shortly after they received all of the relevant information about Malguarnera's testing.  Although defendants disclosed Malguarnera's report on April 21, 2008, plaintiffs did not learn the details of his theory and experiments until his deposition on May 12, 2008.  Plaintiffs also did not have access to the chains used in these experiments until that date.  Because plaintiffs disclosed Engel's 2008 Report within 30 days of learning the details of Malguarnera's testing and gaining access to the chains used in his testing, the court finds that the untimely disclosure of the report is substantially justified.

The court also finds that the late disclosure is harmless.  Defendants claim that they would be substantially harmed by admission at trial of the opinions contained in Engel's 2008 Report because they did not have an opportunity to depose Engel on these opinions during the discovery period.

20

But defendants do not dispute that plaintiffs advised defendants on May 23, 2008, that they intended to serve a supplemental report addressing Malguarnera's opinions on or before June 10, 2008, that plaintiffs attempted to negotiate a 30-day extension of the discovery deadline so that defendants could take a supplemental deposition of Engel, or that defendants advised plaintiffs that they did not intend to take a supplemental deposition of Engel.  See Docket 65-2, Ex. H.  Moreover, because Engel's additional testimony addresses the opinions of defendants' expert and involves the same issue he addressed in his 2007 Report, defendants should not be surprised.  Although defendants have already declined the opportunity to re-depose Engel, the court finds that to the extent defendants are prejudiced by the late disclosure because they did not have the opportunity to depose Engel with regard to his supplemental opinions, this prejudice can be cured by allowing defendants to re-depose Engel.  It is unlikely that a second deposition would be overly burdensome in that the newly disclosed expert testimony is not extensive.

Engel's 2008 Report qualifies as a supplemental report under Fed. R. Civ. P. 26(e), and as a result, is not untimely.  Even if the 2008 Report is untimely, the court finds that Rule 37(c)(1) sanctions are not appropriate

because the untimeliness is substantially justified and harmless.[5]  Accordingly, defendants' motion to strike Engel's supplemental report is denied.

## II.    Summary Judgment

Defendants also move for summary judgment on all of plaintiffs' claims.

### A.    Standard of Review

Fed. R. Civ. P. 56(c) provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(c).  Only disputes over facts that might affect the outcome of the case under the governing substantive law will properly preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  Summary judgment is not appropriate if a dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Id.

The moving party bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  The nonmoving

---

[5] As a result, it is unnecessary to resolve plaintiffs' argument that Engel's 2008 Report is offered as rebuttal testimony subject to the 30-day deadline.

party is entitled to the benefit of all reasonable inferences to be drawn from the underlying facts in the record.  Vette Co. v. Aetna Cas. & Sur. Co., 612 F.2d 1076, 1077 (8th Cir. 1980).  The nonmoving party may not, however, merely rest upon allegations or denials in its pleadings, but must set forth specific facts by affidavits or otherwise showing that a genuine issue exists.  Forrest v. Kraft Foods, Inc., 285 F.3d 688, 691 (8th Cir. 2002).

**B.     Discussion**

In this diversity case, South Dakota law controls the substantive issues.  See Integrity Floorcovering, Inc. v. Broan-Nutone, LLC, 521 F.3d 914, 917 (8th Cir. 2008).  South Dakota has recognized strict liability in tort in products liability cases.  Engberg v. Ford Motor Co., 205 N.W.2d 104, 108-09 (S.D. 1973) (adopting Restatement (Second) of Torts § 402A).  Under South Dakota law, "[o]ne who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer."  Peterson v. Safway Steel Scaffolds Co., 400 N.W.2d 909, 912 (S.D. 1987).  Thus, "[t]he chief elements which a plaintiff must prove in a case involving strict liability in tort are:  (1) the defective and unreasonably dangerous condition of the defendant's product, including the defendant's connection with the product,[6] and (2) a

---

[6] The defendant is connected with the product if the product was in a dangerous and defective condition when it left the manufacturer.  Burley v. Kytec Innovative Sports Equip., Inc., 737 N.W.2d 397, 408 (S.D. 2007).

causal connection between such condition and the plaintiff's injuries or damages." Brech v. J.C. Penney Co., Inc., 698 F.2d 332, 333-34  (8th Cir. 1983) (quoting Fajardo v. Cammack, 322 N.W.2d 873, 876 (S.D. 1982)).  Three classes of defects may give rise to strict liability: "manufacturing defects where individual products within a product line are improperly *constructed, design* defects involving the entire product line, and defect by *failure to properly warn* or instruct users of a product where such failure renders the product hazardous." Peterson, 400 N.W.2d at 912 (emphasis in original).  Plaintiffs allege that the failed chain was defective based on a manufacturing defect and failure to properly warn.

### A.     Manufacturing Defect

With respect to a manufacturing defect, "[a] product is defective when it fails to perform reasonably and safely the function for which it was intended." Shaffer v. Honeywell, Inc., 249 N.W.2d 251, 256 (S.D. 1976), overruled on other grounds, First Premier Bank v. Kolcraft Enters., Inc., 686 N.W.2d 430 (S.D. 2004).  Under South Dakota law, "[n]o specific defect need be shown if the evidence, direct or circumstantial, permits the inference that the accident was caused by a defect." Id.; see also Jahnig v. Coisman, 283 N.W.2d 557, 560 (S.D. 1979).

Here, there is a genuine issue of material fact regarding whether the failed chain was defective and whether this alleged defect caused the chain to

break.  On the one hand, Engel has testified that one or more links of the failed chain were defective, causing the chain to break while carrying a load of only 2,430 pounds.  On the other hand, Todd, Kramer, Malguarnera, and Suhr have testified that the failed chain was not defective and that the root cause of the accident was a dynamic load, i.e., the carriage assembly rapidly falling on the failed chain.

The credibility of these experts and their opinions is a matter for the jury to determine.  Plaintiffs have produced sufficient facts to allow the jury to adopt Engel's defective links theory and reject the dynamic loading theory of defendants' experts.  Mr. White testified that he released the pressure from the forklift's hydraulic system, which placed the full weight of the carriage assembly on the failed chain, before beginning to work on the cylinder.  If the jury believes Mr. White's testimony, it could determine that the weight of the carriage assembly was already resting on the failed chain, so that the dynamic loading postulated by defendants' experts was factually impossible.  Further, Engel offered evidence that the failed chain broke at the link attached to the grab hook, not where the chains used in Malguarnera's dynamic loading testing failed.  Engel also distinguished the failed chain from Malguarnera's exemplar chains by the amount of elongation experienced by the links of each chain.

25

South Dakota law is clear that plaintiffs' claim does not fail because Engel cannot identify a specific defect.[7]  See Shaffer, 249 N.W.2d at 256. Despite the contrary testimony from defendants' experts, plaintiffs have produced sufficient evidence from which the jury could infer that the links of the failed chain were defective, and that this defect caused the chain to fail and the carriage assembly to fall onto Mr. White's lower body.  If the jury finds that the failed chain was defective, the issue of whether this defect rendered the chain unreasonably dangerous is a matter for the jury to decide.  See Peterson, 400 N.W.2d at 913 (finding that the issue of reasonableness in strict liability is usually a jury issue).  As a result, defendants are not entitled to judgment as a matter of law on plaintiffs' strict liability based on manufacturing defect claim.

---

[7] Defendants incorrectly cite several Eighth Circuit cases applying Arkansas law for the proposition that, under South Dakota law, summary judgment ought to be granted where the plaintiff cannot identify a specific defect.  See Ruminer v. Gen. Motors Corp., 483 F.3d 561 (8th Cir. 2007); Crawford v. Sears Roebuck & Co., 295 F.3d 884 (8th Cir. 2002).  These cases clearly apply Arkansas law, and not South Dakota law, so they are irrelevant to the present case.

Defendants' attempt to distinguish Shaffer is also unavailing.  Nowhere in Shaffer does the Supreme Court of South Dakota imply that because the plaintiff in that case was able to present testimony identifying a defect with some specificity, plaintiffs in all cases must identify the defect with some specificity.  The rule in Shaffer is clear that no specific defect need be shown if the evidence permits an inference that the accident was caused by a defect. Shaffer, 249 N.W.2d at 256.

### B.   Failure to Warn

Plaintiffs also assert a failure to warn theory.  A product is defective within the meaning of the strict liability doctrine if the "manufacturer . . . has reason to anticipate that danger may result from a particular use of [its] product, and [it] fails to give adequate warning of such a danger."  Brech, 698 F.2d at 334.  To establish strict liability in tort based on failure to warn, plaintiffs must prove that:

1.   a danger existed associated with a foreseeable use of the product;
2.   an inadequate warning was given regarding the danger;
3.   as a result of the inadequate warning, the product was rendered defective and unreasonably dangerous;
4.   the defective and unreasonably dangerous condition existed at the time it left the control of the manufacturer;
5.   the product was expected and did reach the user without a substantial unforeseeable change in the condition that it was in when it left the manufacturer's control; and
6.   the defective condition was the legal cause of [his] injuries.

Burley, 737 N.W.2d at 409 (quoting South Dakota Pattern Jury Instruction 150-04).  Plaintiffs must produce expert testimony to prove causation for failure to warn.  See id. at 410-11.

Here, plaintiffs do not identify the foreseeable use of the failed chain or the danger associated with this use that they allege defendants should have warned against.  More importantly, plaintiffs have not presented expert testimony on their failure to warn claim.  The only expert testimony they have produced is that of Engel, who opined that the failed chain was defective based

27

on manufacturing defects, not based on inadequate warning.  Indeed, Engel explicitly denied that the way Mr. White used the failed chain to suspend the carriage assembly was the cause of the accident.  Thus, plaintiffs have not provided an evidentiary basis tending to show that the accident was caused by defendants' failure to warn against a foreseeable but dangerous use of the chain.  See id. (finding that it is beyond the common expertise of a jury to determine that the defendant's failure to warn is the legal cause of plaintiff's injuries).  Therefore, defendants are entitled to summary judgment on plaintiffs' failure to warn claim.

### C.    Loss of Consortium

Defendants also seek summary judgment on Mrs. White's loss of consortium claim.  "Loss of consortium is an action that can be maintained only by a spouse and exists only during the [other spouse's] lifetime."  Zoss v. Dakota Truck Underwriters, 590 N.W.2d 911, 914 (S.D. 1999).  "Consortium" refers to "a right growing out of the marital relationship . . . [which] includes the right of either spouse to the society, companionship, conjugal affections and assistance of the other."  Id.  A claim for loss of consortium is derivative in nature.  Robinson v. Brandtjen & Kluge, Inc., 500 F.3d 691, 698 (8th Cir. 2007).  "As such, its validity depends on the validity of the main claim."  Budhal v. Gordon & David Assocs., 287 N.W.2d 489, 493 (S.D. 1980).  Whether and how much Mrs. White is entitled to for loss of consortium due to the injury

to Mr. White is clearly a question of fact for the jury.  Because the court has found that genuine issues of material fact preclude a grant of summary judgment for defendants on Mr. White's underlying strict liability claim, defendants are likewise not entitled to judgment as a matter of law on Mrs. White's loss of consortium claim.  Defendants' motion for summary judgment on this claim is denied.

## CONCLUSION

Based on the foregoing, it is hereby

ORDERED that defendants' motion to exclude the testimony of Engel, and in the alternative, to strike Engel's supplemental report (Docket 56) is denied.

IT IS FURTHER ORDERED that defendants' motion for summary judgment (Docket 52) is granted in part and denied in part.

IT IS FURTHER ORDERED that defendants' request for oral argument on its motions (Dockets 52 & 56) is denied as moot.

Dated January 29, 2009.

BY THE COURT:


/s/ Karen E. Schreier
KAREN E. SCHREIER
CHIEF JUDGE